CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
HOWARD SHNEIDER (Bar No. 309492)
(E-Mail: Howard_Shneider@fd.org)
MARTA VANLANDINGHAM (Bar No. 251661)
(E-Mail: Marta_VanLandingham@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
MICHAEL DEQUITO MONEGRO

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 20-463-DSF |
| Plaintiff, | **MICHAEL DEQUITO MONEGRO'S POSITION REGARDING SENTENCING; EXHIBITS** |
| v. | |
| MICHAEL DEQUITO MONEGRO, | |
| Defendant. | Hearing date: November 7, 2022<br>Hearing time: 8:30 a.m. |

Michael Dequito Monegro, through his counsel, submits his position regarding sentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: October 17, 2022        By:  */s/ Howard Shneider*
                                            Marta VanLandingham
                                            Howard Shneider
                                            Deputy Federal Public Defenders
                                            Attorneys for Michael Dequito Monegro

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................... 1

II. ARGUMENT .............................................................................................. 3

    A.    The Guidelines and Applicable Legal Principles ......................... 3

        1.    For the second degree murder guideline to apply the government must establish its applicability by clear and convincing evidence. ................................................................... 3

        2.    If the government cannot prove by clear and convincing evidence that Mr. Monegro did not suffer from an extremely irrational and paranoid state of mind that severely impaired his capacity for self control, then the Court must apply the voluntary manslaughter guideline. ................................ 4

    B.    The History and Characteristics of the Defendant ...................... 6

    C.    The Nature and Circumstances of the Offense ........................... 7

        1.    A perfect storm of stressors resulted in a clear psychotic break. ...... 7

        2.    Mr. Monegro's unfounded delusions focused on Mr. Santillan and grew increasingly extreme. ................................. 10

        3.    Mr. Monegro's attack on Mr. Santillan stemmed from delusional but overwhelming panic and terror. .................................. 12

    D.    Mr. Monegro's Diagnoses and Prognosis ................................ 14

    E.    A sentence of 63 months under the guidelines for voluntary manslaughter, followed by Mr. Monegro's deportation from the United States, provides for just punishment, general and specific deterrence, and protection of the community. ............................................. 16

    F.    The requested sentence affords adequate general deterrence and respect for U.S. law considering that the United States has no meaningful interest in this case. ........................................ 17

III. CONCLUSION .......................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Kleeman v. United States Parole Commission*,
  125 F.3d 725 (9th Cir. 1997) ..................................................................2, 5

*United States v. Felix*,
  561 F.3d 1036 (9th Cir. 2009) .....................................................................3

*United States v. Jordan*,
  256 F.3d 922 (9th Cir. 2001) ....................................................................3, 4

*United States v. Quintero*,
  21 F.3d 885 (9th Cir. 1994) .........................................................................2

*United States v. Valensia*,
  222 F.3d 1173 (9th Cir. 2000) .....................................................................4

*United States v. Valle*,
  940 F.3d 473 (2019) ................................................................................3, 4

**Statutes**

18 U.S.C. § 1111 ...........................................................................................2

18 U.S.C. § 1119 .........................................................................................18

18 U.S.C. § 2280 .......................................................................................1, 3

18 U.S.C. §§ 2423(b), (c) ...........................................................................18

18 U.S.C. § 3553(a) ....................................................................................17

# I.  INTRODUCTION

For his first 42 years, Michael Monegro lived an unexceptional life. He was kind, healthy, well-adjusted, and devoted to his family. All knew him to be generous and to avoid confrontation. He worked hard as a sharecropper, then went to maritime college to make a better living as a sailor. He received satisfactory work reviews as he earned his way up the merchant marine responsibilities ladder, and was respected and liked by his colleagues and supervisors.

Then his mind broke. Under intense pressure without release, Mr. Monegro began to suffer delusions, all revolving around his immediate supervisor. He came to believe that the bosun, Manolito Santillan—whom Mr. Monegro had never met or worked with until the months before the crime—was stalking him, was entering Mr. Monegro's cabin when he was out, was hacking his phone and social media, was engaged in an illicit relationship with his wife who was in the Philippines, and was going to have Mr. Monegro assassinated by sinister relatives on his return home at the end of his contract. Mr. Monegro was so convinced of the absolute truth of his delusions and of his imminent death at the hands of this imaginary archvillain that he attacked first. He stabbed Mr. Santillan frantically and repeatedly, until he could physically stab him no more. As noted by Dr. Stephen C. Phillips, J.D., Psy.D., the crazed nature of this attack is in and of itself the best "evidence of the extent and power of [Mr. Monegro's] delusional thinking." (Ex. A, Phillips Rprt., at 10.)[1]

The psychotic break that resulted in these extreme delusions and in the death of Manolito Santillan is the basis for the defense position that Mr. Monegro's sentence should fall at the bottom of the guideline range for voluntary manslaughter. Mr. Monegro has pleaded guilty to one count under 18 U.S.C. § 2280(a)(1)(B), committing an act of violence against a person on board a ship likely to endanger the safe

---

[1] The reports of Dr. Phillips and Dr. Hans Selvog are filed concurrently under seal as Exhibits A and B. They are filed under seal due to the detailed confidential mental health information contained in each report.

1

navigation of the ship. The government has indicated that it will seek a sentence within the guideline range for second degree murder. The Probation Office recommends a sentence of 210 months of incarceration, at the high end of the advisory range for second degree murder. But second degree murder does not describe Mr. Monegro's crime. As delineated in 18 U.S.C. § 1111, second degree murder requires proof of the element of malice aforethought.

Here, because of Mr. Monegro's delusional state, there was intent to kill, but no malice. "Intent without malice, not the heat of passion, is the defining characteristic of voluntary manslaughter." *United States v. Quintero*, 21 F.3d 885, 890 (9th Cir. 1994). As noted in the Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit, Instr. 16.3: Manslaughter—Voluntary (attached as Ex. C), the Ninth Circuit has found that "an 'extremely irrational and paranoid state of mind that severely impairs a defendant's capacity for self control' may also negate the malice attached to an intentional killing." *Kleeman v. United States Parole Commission*, 125 F.3d 725, 732 (9th Cir. 1997). Here, as Dr. Phillips has diagnosed, and as is clear from all the facts of the case, Mr. Monegro committed the crime only because his reality had been entirely subsumed by a "Delusional Disorder, Persecutory Type." (Ex. A at 10.) This delusional disorder, per Dr. Phillips, is unlikely ever again to warp Mr. Monegro's views of others. (*See id.* at 11.)

There is no basis that the government has presented, or that the Probation Office has proffered, in support of the element of malice—a state of mind that presupposes rational judgment. Instead the evidence is clear that Mr. Monegro acted in an "extremely irrational and paranoid state of mind." Thus, the guideline range for voluntary manslaughter, at the low end, best fits the nature and circumstances of the offense and the history and characteristics of the defendant. The defense seeks a sentence of 63 months of incarceration, followed by Mr. Monegro's deportation to his home country of the Philippines.

///

2

## II.  ARGUMENT

**A.    The Guidelines and Applicable Legal Principles**

Mr. Monegro objects to the PSR's conclusion that the second degree murder guideline applies. (*See* PSR ¶¶ 23-27.) The Statutory Index at Appendix A is the starting point for determining the applicable guideline. The introduction to Appendix A states that, "[i]f more than one guideline section is referenced for the particular statute, use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." Here, for 18 U.S.C. § 2280, Appendix A lists multiple potentially applicable guideline sections, including all of the homicide-related sections. In the plea agreement, the parties agreed that the defense would argue that the voluntary manslaughter guideline applies and the government would argue that the second degree murder guideline applies. (*See* Plea Agreement, Dkt. 63, ¶¶ 12-13.)

Mr. Monegro's state of mind at the time of the offense negates malice, and makes the voluntary manslaughter guideline under § 2A1.3 the appropriate guideline here. Before analyzing why the voluntary manslaughter guideline applies, it is important to walk through the applicable legal principles.

**1.    For the second degree murder guideline to apply the government must establish its applicability by clear and convincing evidence.**

Because the second degree murder guideline would increase the base offense level by nine points—from 29 to 38 points—the application of that guideline serves to enhance the sentence considerably. The burden of proof for such an enhancement depends on the "magnitude of the finding's effect on the sentencing range." *United States v. Valle*, 940 F.3d 473, 479 (2019). Typically, the government must establish an enhancement by a preponderance of the evidence, but when "there is 'an extremely disproportionate impact on the sentence[,]'" the government must establish the enhancement by clear and convincing evidence. *Id.* (quoting *United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001)); *see United States v. Felix*, 561 F.3d 1036, 1045 (9th Cir. 2009) (explaining that, when a sentencing factor "has an extremely

3

disproportionate effect on the sentence relative to the offense of conviction, the government may have to prove the factor by clear and convincing evidence") (cleaned up). In *Jordan*, the Ninth Circuit laid out a multi-factor test to determine if the clear-and-convincing standard should apply. *Jordan*, 256 F.3d at 928. But *Jordan* and other recent cases have "focused entirely on how enhancements increased both the offense level and the length of the recommended Guidelines range." *Valle*, 940 F.3d at 479 (citing *Jordan* and *United States v. Valensia*, 222 F.3d 1173, 1182 (9th Cir. 2000)).

Here, the nine-point increase from the voluntary manslaughter guideline to the second degree murder guideline would have an "extremely disproportionate" effect on Mr. Monegro's sentence. It would raise his base offense level from 29 to 38, which, after taking into account acceptance, would increase the guideline range from 63-78 months to 168-210 months. More than doubling the guideline range and increasing the low end of the range by 8.75 years, this is the type of enhancement that the government is required to prove by clear and convincing evidence.

> **2.**   **If the government cannot prove by clear and convincing evidence that Mr. Monegro did not suffer from an extremely irrational and paranoid state of mind that severely impaired his capacity for self control, then the Court must apply the voluntary manslaughter guideline.**

Beyond Appendix A's generalized guidance to "use the guideline most appropriate for the offense conduct charged," the guidelines do not explain whether the second degree murder or voluntary manslaughter guideline should apply under the facts here. In the absence of direction from the guidelines, it is useful to turn to Ninth Circuit authority. The Ninth Circuit's Model Criminal Jury Instructions serve as a good starting point. The model instructions for second degree murder and voluntary manslaughter are attached here at Exhibit C. The commentary to the second degree murder instruction explains that "heat of passion is not the only condition that might serve as a defense to a murder charge and reduce the offense to manslaughter." (Ex. C at 375.) The

commentary goes on to cite *Kleeman*, 125 F.3d at 732, and explain "that an 'extremely irrational and paranoid state of mind that severely impairs a defendant's capacity for self control' may also negate the malice attached to an intentional killing." (Ex. C at 375 (quoting *Kleeman*).) The commentary to the voluntary manslaughter instruction includes the same language from *Kleeman* and again explains that such a state of mind may negate malice. (Ex. C at 378.)

In *Kleeman*, the Ninth Circuit reviewed the determination of the U.S. Parole Commission under a treaty between the United States and Mexico that allows citizens of one country convicted of a crime in the other country to serve the sentence in the person's home country. The task before the court was to "determine the most analogous offense of conviction[.]" *Kleeman*,125 F.3d at 727. The Parole Commission found that Kleeman had killed her victim with malice, and concluded the analogous U.S. crime to her Mexico conviction was second degree murder. *Id.*

The Ninth Circuit disagreed with Parole Commission's conclusion. The court explained that "[m]alice cannot exist when, as the Commission found, Kleeman was in an extremely irrational and paranoid state of mind brought about by the external manipulation of her already confused thinking." *Id.* at 732. Analyzing the circumstances of the killing, the court concluded the evidence failed to establish malice. *Id.* The court focused on the specific circumstances of the offense, including: "[Kleeman's] drug use, her history of sexual abuse and psychiatric problems coupled with Scott's threats and sexual advances, her delusional state evidenced by her receipt of images from the television, and Jerry's 'sinister urgings' leading to a deluded irrational intent or passionate state of mind at the moment of the offense." *Id.*

As in *Kleeman*, the Court here must analyze the circumstances of the offense. If the government cannot prove malice by clear and convincing evidence, then the Court must apply the voluntary manslaughter guideline. As explained below, just as in *Kleeman*, Mr. Monegro was laboring under an extremely irrational and paranoid state of mind that severely impaired his capacity for self control at the time of the killing.

## B.     The History and Characteristics of the Defendant

Attached as Exhibit B is a psychosocial history of Mr. Monegro compiled over the course of several months by Dr. Hans Selvog, Ph.D., L.C.S.W., based on numerous interviews with Mr. Monegro and members of his family, as well as a thorough review of social history documents. (*See* Ex. B, Selvog Eval., at 2-3.) In addition, Dr. Phillips's Evaluation & Assessment Report includes a social history of Mr. Monegro, along with his clinical findings, diagnoses, and recommendations for mental health treatment. (Ex. A at 2-8.) Herein only a summary is provided, primarily to underscore the point that, until just a few months before Mr. Monegro committed the instant offense, he exhibited no tendencies to violence, to criminality, or to anything other than the characteristics of a "normal" Filipino man from a poor background who was kind and generous and worked hard to support his family. Until he suffered a psychotic break, he was not a man who would hurt a fly.

Michael Monegro was born in September of 1978 in Cabatuan, Iloilo, Philippines, to sharecroppers on a rice farm. He had two brothers and a sister. His father died of cirrhosis of the liver when Mr. Monegro was a child. Mr. Monegro worked on the farm with his mother and siblings while attending a local public school, until he could enroll at maritime college in pursuit of a better life and income. After graduation he worked at odd jobs until he was able to secure his first position on a container ship, initially working in the mess (or kitchen). Eventually he worked his way up the container-ship hierarchy, achieving the position first of ordinary seaman and then reaching the higher level of able seaman, earning certifications in various specialties such as welding. He moved from ship to ship under contracts of about eight to ten months each, with two to four months between these long sea voyages.[2] He

---

[2] Mr. Monegro worked with an employment agency in the Philippines that assisted with placement and training and periodically evaluated the physical and mental health status of its candidates for container-ship contracts. Approximately 1.6 million

garnered positive performance evaluations and got along well with his co-workers and his superiors. (*See, generally*, Exs. A and B.)

When he was 31 Mr. Monegro married Donally Repaja, an accountant at an international firm. The two have a son who is now ten years old. Mr. Monegro is torn apart at the fact that his actions will keep him away from his boy as the child grows up. (*See, e.g.*, Ex. A at 3, 7; Ex. D, Michael Monegro letter.)

The many letters attached here from Mr. Monegro's family and friends universally describe him in glowing terms, as caring, quiet but fun, hardworking, and most of all as generous—many letters include stories of Mr. Monegro helping others who were more in need than he by helping them build houses, donating money, or giving his time and resources in other ways. A couple of the correspondents write about Mr. Monegro's prolonged grief at the death of his dog. (Ex. E, Letters of support.) All the correspondents express deep shock at the news of his crime; it is clear that nothing in his life foreshadowed any capacity in Mr. Monegro to commit an act of violence, much less one as senseless as the brutal killing of Mr. Santillan.

**C.    The Nature and Circumstances of the Offense**

**1.    A perfect storm of stressors resulted in a clear psychotic break.**

There appears to be no one trigger to Mr. Monegro's psychotic break. For example, there is no evidence that Mr. Monegro ever abused drugs or alcohol. He smoked some marijuana as a youth and drank socially, but his alcohol use while aboard ship was limited due to restricted access. Also, regular drug testing was a condition of his employment. (*See* PSR ¶¶ 60-62; Ex. A at 8.)

///

---

sailors worldwide conduct approximately 90% of the world's trade; the Philippines as a country provides the second-largest number of these seafarers, (Ex. F, Combined newspaper articles, Seattle Times article at 2.) On many ships, including the ship on which this offense took place, the seamen are almost all Filipino, while the officers come primarily from Eastern Europe.

Instead, his break was caused by a concatenation of factors of various types, that accumulated under conditions where avenues of relief were foreclosed by the nature of his work and the restrictions of the pandemic. Per Dr. Phillips:

> Among the major stressors were the length of the commitment at sea, confinement on board the ship for the entire voyage due to COVID protocols, the death of Mr. Monegro's mother-in-law who helped his wife care for their son while Ms. Monegro worked full time and Mr. Monegro was at sea, the danger of the work being performed, the length of his shifts, the threat of piracy at sea, and a back injury suffered during the trip with resulting pain and restricted mobility.

(Ex. A at 1.) The back injury, suffered during a storm in a German port (Ex. B at 6), remained unaddressed, and affected Mr. Monegro's ability to do his work without pain. The loss of his wife's mother increased Mr. Monegro's financial distress; the family needed both his and his wife's incomes, but their primary child-care provider was gone, impeding his wife's ability to work. Also, Mr. Monegro had been hoping to leave the difficult and stressful shipboard life to start a delivery business; he had even bought a motorcycle toward that goal. But he decided he had to complete his contract and continue taking further contracts, because three years remained on the mortgage of the family home. (Ex. E, Donally Monegro letter, at 2.)

All of this took place during a pandemic that affected the life of almost everyone everywhere, but that had a notably disproportionate impact on seafarers.[3] Even under the best of circumstances the work of a merchant seaman is difficult. Over the course of eight-to-eleven-month contracts the seamen would work shifts typically running from midnight until 4:00 a.m., then eight hours off, then work again from noon to 4:00 p.m.

---

[3] Counsel for Mr. Monegro have compiled many newspaper articles and scientific studies analyzing the effect of the pandemic on seafarers. Appended here are three of the articles (Ex. F), though many more can be provided upon request.

They maintained these cycles seven days a week, over the months of their contracts. (Ex. F, Inkstone article at 7.) The work was physical, repetitive, and usually monotonous—until a storm hit, or a cargo container broke loose, or pirates attacked. (*See* Ex. F.)

Usually the seamen could look forward to time off while in port; after anchoring they would be given time for rest and recreation as the containers were unloaded and loaded. But during the pandemic, such shore leaves were almost entirely cut off, as ports around the world imposed quarantine regulations; there was no release from the tedious stresses of the ship. More importantly, as travel by air was cut off—the Philippines remained under tight quarantine during much of 2020—replacement sailors became unavailable. Seamen's contracts were extended involuntarily, and ships often had to function with a reduced complement of sailors. (*See* Ex. F.) Reports of suicide by crew members trapped aboard ships abounded. (*Id.*) One study out of Yale University, published in October of 2020, "spoke to 1,572 seafarers of different ranks around the world and found that, in the previous 2 weeks, 20% had contemplated suicide or self-harm, 25% had suffered depression and 17% had experienced anxiety." (Ex. F, Inkstone article, at 4.)

In these circumstances Mr. Monegro snapped. The crew of the Ravenna, Mr. Monegro's ship, had not been allowed ashore since April of 2020. (Ex. G, J. Vega depo, at 15.) Mr. Monegro had never been one to share his problems with others, even his wife; "He does not talk much and whenever I ask question about him, he would just say he is fine." (Ex. E, Donally Monegro letter, at 2.) In pain, in financial distress, with no means of release and no end in sight, Mr. Monegro suffered a psychotic break. "Viewing the totality of available information, and after having observed Mr. Monegro's paranoid and delusional thinking first hand, the data supports the conclusion that the totality of stressors and on-board isolation caused Mr. Monegro to have a psychotic break and a resulting Delusional Disorder." (Ex. A at 2.)

///

9

### 2.   Mr. Monegro's unfounded delusions focused on Mr. Santillan and grew increasingly extreme.

There is no telling why Mr. Monegro's delusional disorder focused so tightly on his bosun, Mr. Santillan. By all accounts from Mr. Monegro's shipmates, Mr. Santillan was a good boss and had no animosity toward Mr. Monegro, and certainly no designs on his family or on his life. Other seamen described Mr. Santillan as a good bosun who got along with his co-workers and was patient and kind. (Ex. H, R. Esperon depo, at 17; Ex. G at 18.) No other crew members witnessed any mistreatment of Mr. Monegro by the bosun. (Ex. B at 4.)

But, starting some time in the months before the offense, Mr. Monegro began developing an irrational set of beliefs about Mr. Santillan. These delusions as to the bosun's vicious vindictiveness toward him are detailed in Dr. Selvog's report. (*See* Ex. B at 4-12.) They fall, however, into certain categories: extreme bullying; stalking and invasion of Mr. Monegro's privacy; interference with his family and his wife, in a sexually threatening way that emasculated Mr. Monegro; and having the intent and means to kill Mr. Monegro when he returned to the Philippines.

With regard to the bullying, Mr. Monegro believed that Mr. Santillan was careful to denigrate him and yell at him only when the two were alone. (*Id.* at 6.) He believed that the bosun would assign Mr. Monegro, by himself, to tasks that required two people—like water blasting or painting the anchor chain—and then would berate him for taking too long or not doing the job well. "When Bosun Santillan turned red with rage and yelled at him, they were alone together. No one else witnessed these moments. After a scolding, in the presence of others, Mr. Monegro would ask Bosun Santillan to repeat his angry criticisms, but he did not." (*Id.* at 7.)

Mr. Monegro also developed the delusion that Mr. Santillan was stalking and invading the privacy of his cabin and his electronics. At one point he decided that items in his cabin had been rearranged. He went to great lengths—gleaned, perhaps, from spy movies—to prove such invasions.

[H]e planted a piece of paper on top of the door, so, when the door was opened in his absence, the paper fell. Now, someone might notice the paper when it fell and then put the piece of paper back in position, so he marked the paper by drawing a thin line that he positioned a certain way but was not detectable. When someone tried to replace the paper on the door, the line would not match up. Several times Mr. Monegro found the paper on the floor after returning to his room. In addition to the paper, he attached a sewing kit thread to the inside handle of his door, looped it over the top of the door, and attached it to the outside door handle; so, when someone entered, it broke the thread, which was fine enough that it was difficult to see. Mr. Monegro found evidence the thread was broken once, and the paper was dislodged numerous times. Mr. Monegro noted that Bosun had the master key to all cabins.

(*Id.* at 10; *see also* Ex. I, R. Lamerez depo., at 10.)

This perceived invasion of Mr. Monegro's privacy was not only physical; Mr. Monegro also believed Mr. Santillan to be a master hacker who had wormed his way into Mr. Monegro's phone so he could listen in on his phone calls and break in on his texts and social media. Mr. Monegro told a co-worker that someone had hacked his cell phone; the colleague found that assertion unreasonable. (Ex. G at 65.) Mr. Monegro decided that someone was logging into his Facebook account. And when Mr. Monegro went to his cabin to call his wife, he believed that Mr. Santillan followed him and entered his own cabin just across the hall. During his phone call the signal would cut in and out, and the volume would rise and fall. At one point Mr. Monegro spoke to his wife about a brace for his back; shortly thereafter "Bosun Santillan mentioned a photo of the brace and an instructional video on how to wear it, that Mr. Monegro had on his cell phone and had transferred with a USB cable to a thumb drive." (Ex. B at 8-9.) He

11

believed the bosun would comment on the content of his private communications to taunt him. (*Id.* at 7-9.)

"In the days or weeks leading up to the incident, Mr. Monegro came to believe that Bosun Santillan was communicating directly to his wife, Donally and telling her negative stories about him." (*Id.* at 9.) Mr. Monegro believed that Mr. Santillan had told Donally that Mr. Monegro was gay. (*Id.* at 18.) Mr. Monegro's calls with his wife grew more frequent and angry and he exhibited signs of jealousy. When he confronted her with talking to his superior about him, she reasonably responded that "you never introduced me to your colleagues since they were changed and now, you're telling me that I know your superior." (Ex. E, Donally Monegro letter, at 3.) But Mr. Monegro was convinced that the bosun was seducing his wife, turning her against him, and destroying his family.

Mr. Monegro also believed his family would be destroyed when Mr. Santillan had him murdered. He interpreted the bosun showing him pictures of his own family on his cell phone as a direct threat on Mr. Monegro's life; he believed that the bosun was putting him on notice that he had powerful connections in the Philippine military and law enforcement, and that he would have his brother in the military kill Mr. Monegro when he arrived back in the country at the end of his contract. (Ex. B at 4-5.) "According to Mr. Monegro, the day before the ship arrived in Long Beach [and Mr. Monegro's contact ended], Bosun threatened Michael's life telling him his cousin would kill Michael once he returns to the Philippines." (*Id.* at 5.) Mr. Monegro's belief, his delusion, his truth, was so absolute, that he perceived no alternative to protect himself and his family than to strike first, and strike hard.

### 3. Mr. Monegro's attack on Mr. Santillan stemmed from delusional but overwhelming panic and terror.

A few days before the Ravenna was due to dock at the Port of Long Beach, and both Mr. Monegro and Mr. Santillan were to disembark and fly back to the Philippines, Mr. Monegro's outward behavior changed drastically. His disorder became clear to his

12

co-workers. Starting about three days before the attack, "[e]very time that we're working, [Mr. Monegro is] uneasy. He's always walking around, and he's not really working." (Ex. H at 20.) "Three days before the incident happened, Mr. Monegro we noticed was walking—walking back and forth. He is not working—he's not working correctly. He's not working right. So with himself it seems like he wasn't bathing nor he wasn't changing his clothes, and he was beginning to smell." (*Id.* at 73.) "Before the incident happened, we were—we were performing chipping at the aft station. So what I noticed from him was he could not stand still in one position. He would go to one side. He would return. He's always pacing. He's always walking." (Ex. G at 64.) His psychotic behavior made a strong impression on, and discussed by, all the crew. (Ex. I at 37; *see also id.* at 14; Ex. G at 21; Ex. J, Gutlay depo, at 22, 86.)

Then, the day before the ship's arrival at Long Beach, the bosun met with the crew before the first shift. They gathered, as usual, in the locker room to discuss the morning's work. The bosun spoke about how he and Monegro were about to end their contracts and leave their ship. (Ex. H at 22-23.) That statement triggered Mr. Monegro's attack; in his delusional state he heard it as a direct threat, as a promise, to end his life imminently. So he attacked first. He began stabbing Mr. Santillan in full view of the crew. (PSR ¶ 10.) Various crew members tried to stop him, throwing trash cans at him or hitting him on the head with objects. (PSR ¶¶ 10, 11; Ex. H at 26.) He ignored all the other crew members, and kept stabbing, until he grew too tired to continue. (PSR ¶ 10.) But he did not try to hurt anybody else; when the captain was called down to the scene, Mr. Monegro followed him to a conference room, still holding the knives; it was clear to all that Mr. Monegro's sole target had been the bosun. (PSR ¶ 11; Ex. I at 42-44.)

Throughout the attack, Mr. Monegro yelled repeatedly, "You are the one that destroyed my family." (Ex. H at 26; *see also* PSR ¶ 15; Ex. I at 18; Ex. G at 26.) This concrete belief of Mr. Monegro's was the only basis he had for his act of frenzied destruction. And it was entirely delusional. As one witness said, this was wrong; it

13

made no sense; it came out of absolutely nowhere. (Ex. H at 75.) The only sense was in Mr. Monegro's tortured brain.

Mr. Monegro's killing of Mr. Santillan is incredibly tragic. But his act was not malicious; it was not based in any real interactions, opinions, judgments. Mr. Monegro was caught in a delusional fantasy world outside of reality. Thus, he cannot be said to have acted out of malice.

## D.    Mr. Monegro's Diagnoses and Prognosis

On the basis of all the facts, as well as on extensive interviews and his own expertise, psychologist Dr. Stephen R. Phillips has diagnosed Mr. Monegro with Delusional Disorder, Persecutory Type, springing from trauma, and resulting in a current state of self-protective dissociation from the facts of his crime. (Ex. A at 10.) "The available data supports the conclusion that while onboard the ship on which the events underlying these proceedings took place, Mr. Monegro suffered a psychotic break with a resulting Delusional Disorder." (*Id.*) Mr. Monegro's descent into psychotic thinking was noted in the months preceding the offense by his wife and family members. (*Id.* at 11.) Then, "[i]n the days leading up to the attack on Mr. Santillan, Mr. Monegro's hygiene, attitude, and functioning all suffered, consistent with the onset of an acute episode of mental illness," culminating in his taking Mr. Santillan's life in a particularly mindless way. (*Id.*)

Dr. Phillips explains:

> The diagnostic criteria for a Delusional Disorder under the taxonomy defined by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM 5) are fully satisfied based on all of the available data. "Delusions are fixed beliefs that are not amenable to change in light of conflicting evidence." DSM 5, p. 97. The relevant diagnostic criteria include delusions that persist for a month or longer, the absence of schizophrenia, the absence of

14

long-term decrements in functioning except as they relate to the delusions or their ramifications, the absence of prolonged depressive or manic episodes, and the absence of an organic cause such as drugs or a medical condition. Given the nature of Mr. Monegro's paranoid ideas as to Mr. Santillan's actions and intentions, his Delusional Disorder is best categorized as of a Persecutory Type.

(*Id.*) Dr. Selvog, who concluded in his earlier investigation that Mr. Monegro suffers from Delusional Disorder, explains in detail how each of these criteria is met in Mr. Monegro's case: the timing, the absence of schizophrenia or an organic cause for his psychotic break, the ability to function outside of his delusions, etc. (Ex. B at 17-19.) He also notes the characteristics of the Persecutory Type of this disorder: "belief of being conspired against, cheated, spied on, followed, poisoned, maliciously maligned, harassed, or obstructed in the pursuit of long-term goals…. *Individuals with persecutory delusions are often resentful and angry and may resort to violence against those they believe are hurting them*." (*Id.* at 19 (emphasis in original), quoting from "American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders," Fifth Edition, 2013, at 91-92.) All of these criteria clearly apply to Mr. Monegro and the tragic death of Mr. Santillan.

Both Dr. Selvog and Dr. Phillips emphasize, however, that Mr. Monegro's delusional disorder developed in the context of the trauma he experienced on board the Ravenna and focused solely on one person—on his immediate supervisor, the bosun, Manolito Santillan. The characteristics of his disorder are such that they are highly unlikely to arise again in any other context, with anybody else as a focus of delusions. Per Dr. Selvog, "the delusional obsession was specific to an individual, Bosun Santillan, and never to anyone else before; and the fixed, false belief occurred while employed on a cargo ship, a job Mr. Monegro will never again hold." (Ex. B at 20.) Dr. Phillips agrees: "Mr. Monegro's delusional belief system is specific to Mr. Santillan,

shows no signs of generalizing to others, and is likely to be reduced or resolved by the administration of psychotropic medication. He does not appear to pose a threat to any identified others or the general public." (Ex. A at 11.)

Thus, the experts agree that the threat posed by Mr. Monegro has passed with the killing of the person around whom his psychosis took shape. Logically speaking the killing was senseless; but the distinct, delusional "sense" present in Mr. Monegro's mind has now passed. Mr. Monegro respectfully requests that this Court take that circumstance into account when determining the sentence to impose.

**E.  A sentence of 63 months under the guidelines for voluntary manslaughter, followed by Mr. Monegro's deportation from the United States, provides for just punishment, general and specific deterrence, and protection of the community.**

Mr. Monegro took Mr. Santillan's life, but his offense amounts to voluntary manslaughter, not murder. His delusional, psychotic state negated the element of malice, which needs to be proven by the government for the second degree murder guideline to apply. Malice is defined in this Court's jury instructions: "[t]o kill with malice aforethought means to kill either deliberately and intentionally or recklessly with extreme disregard for human life." (*See* Ex. C at 374.) Thus, the malice element presupposes the ability for deliberateness, intentionality, or at least the capacity to cast those mental processes aside and act recklessly. A person in a delusional, psychotic state is unable to perceive or act upon those intellectual strictures.

A sentence of 63 months constitutes a significant punishment, as Mr. Monegro is kept from his home, his culture, and his family, and will need to find another form of family support on his release. The sentence also ensures that Mr. Monegro will receive the psychological treatment he requires for his mental conditions—both for any residual delusional disorder, and for the post-traumatic distress disorder (PTSD) from which he suffers as a result of his crime. Dr. Phillips has diagnosed Mr. Monegro as suffering from PTSD, explaining: "Mr. Monegro witnessed his own actions resulting in

16

the death of Mr. Santillan, exhibits dissociative reactions and flashbacks of memory to the horrific events, consciously and unconsciously avoids memory of the events, is detached and estranged from others, experiences problems with concentration, and exhibits resulting impairment of functioning." (Ex. A at 11.) His dissociation is an attempt by Mr. Monegro's mind to protect him from the horror of his own actions. (*Id.*) In a sense, his mind is in prison, separate and more detrimental than the jail in which his body is kept.

The experts agree that Mr. Monegro requires mental health treatment, both intense therapy and psychotropic medication. This treatment can be provided in a medical facility of the Bureau of Prisons. With the help of such care, at the end of his incarceration, he could return to his home and his family and establish a new life. He will pose no danger to others. Based on the foregoing, a sentence in the guideline range for voluntary manslaughter, followed by inevitable deportation as a result of the conviction, will be sufficient, but not greater than necessary, to achieve the goals outlined in 18 U.S.C. § 3553(a).

**F.     The requested sentence affords adequate general deterrence and respect for U.S. law considering that the United States has no meaningful interest in this case.**

Under the § 3553(a) factors the Court should also keep in mind where the national interests lie—or fail to lie—in this case. Tragic as Mr. Santillan's death may be, the Court should consider that none of the individuals involved in the case—including the defendant, the victim, and all the witnesses—have any connection to the United States. Mr. Monegro and Mr. Santillan both are from the Philippines. Half of the witnesses who testified in deposition are also Filipino, and the other half are from Eastern Europe. The ship was a Liberian-flagged container ship also not associated with the United States. (PSR ¶ 9.) The *only* reason this case is being heard by a U.S. district court is because of the location of the ship at sea when the crime took place.

This unique set of circumstances does not call for the same level of punishment that it might if there were at least *some* meaningful link to the United States. Typically, when federal crimes involve foreign interests, there is a connection to the United States in the form of a U.S. citizen defendant, U.S. citizen victim, or travel to or from the United States. For example, 18 U.S.C. §§ 2423(b), (c) punishes travel to a foreign country and conduct in a foreign country, but the statute requires that the defendant be a U.S. citizen, or at least travel to or from United States. Under 18 U.S.C. § 1119 it is illegal to commit murder abroad, but it is only a U.S. crime if both the defendant and victim are U.S. nationals.

But here, none of those links to the United States are present. As a result, the long prison sentence requested by Probation and called for under the murder guideline do not serve the same purposes of general deterrence and promoting respect for U.S. law. The requested sentence of 63 months serves those purposes as to Mr. Monegro, who has never been to prison and is going through an extremely difficult situation navigating the U.S. custodial system. But a longer sentence will not serve to deter the general public or promote respect for the law among the U.S. population at large. There simply are no ties here to the United States—beyond geographical location at sea—that would make the punishment in this case have significance beyond the individual punishment to Mr. Monegro. With that reality in mind, the requested sentence of 63 months is sufficient to do justice here.

///

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.  CONCLUSION

Based on the foregoing, Mr. Monegro respectfully requests the Court impose a sentence under the guideline for voluntary manslaughter of 63 months of incarceration.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: October 17, 2022         By:  */s/ Howard Shneider*

Marta VanLandingham
Howard Shneider
Deputy Federal Public Defenders
Attorneys for Michael Dequito Monegro