E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Assistant United States Attorney
Chief, Environmental and Community Safety Crimes Section
JEFFREY M. CHEMERINSKY (Cal. Bar No. 270756)
Assistant United States Attorney
Deputy Chief, Violent and Organized Crime Section
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
Assistant United States Attorney
Environmental and Community Safety Crimes Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6520/3359/8644
     E-mail:    Jeffrey.Chemerinsky@usdoj.gov
                Mark.A.Williams@usdoj.gov
                Matthew.O'Brien@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 20-CR-463-DSF |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | Hearing Date: November 7, 2022 |
| MICHAEL DEQUITO MONEGRO, | Trial Time:   8:30 a.m.<br>Location:    Courtroom of the |
| Defendant. | Hon. Dale S. Fischer |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mark A. Williams, Jeffrey M. Chemerinsky, and Matthew W. O'Brien, hereby submits its Sentencing Position regarding MICHAEL DEQUITO MONEGRO.

This submission is based upon the attached memorandum of points and authorities, the Presentence Investigation Reports disclosed on

October 3 and 5, 2022, the files and records in these cases, and such further evidence and argument as the Court may permit.

Dated: October 17, 2022          Respectfully submitted,

                                          E. MARTIN ESTRADA
                                        United States Attorney

                                        SCOTT M. GARRINGER
                                        Assistant United States Attorney
                                        Chief, Criminal Division

                                           /s/
                                        MATTHEW W. O'BRIEN
                                        MARK A. WILLIAMS
                                        JEFFREY M. CHEMERINSKY
                                        Assistant United States Attorney

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

PAGE

I. INTRODUCTION...................................................1

II. FACTUAL BACKGROUND............................................1

    A.    The *MSC Ravenna*..........................................1

    B.    The Murder................................................2

    C.    The FBI Interview.........................................5

III. THE PRESENTENCE INVESTIGATION REPORT..........................6

IV. THE GOVERNMENT'S SENTENCING POSITION..........................6

    A.    The Burden of Proof.......................................7

    B.    The Offense Level for Second-Degree Murder Should
           Apply.....................................................7

    C.    An Upward Departure Is Warranted..........................9

V. CONCLUSION....................................................12

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

On September 20, 2020, on a ship off the coast of Southern California, defendant MICHAEL DEQUITO MONEGRO ("defendant") murdered M.S. by stabbing him dozens of times, stopping only when, by defendant's own admission, he was too tired to continue. M.S. did not provoke the attack, and did not fight back.

The Presentence Investigation Report ("PSR") determined that the base offense level for second-degree murder applies to defendant's crime, rather than the offense level for voluntary manslaughter. The government concurs, and has no objections to the PSR. Whereas the Probation Office is recommending a high-end sentence of 210 months, the government respectfully requests a sentence of 240 months due to the heinous nature of the crime and the danger defendant poses to society.

**II.   FACTUAL BACKGROUND**

The facts surrounding the murder do not appear to be in dispute. They are accurately set forth in the PSR, the Factual Basis to defendant's plea agreement (Dkt. No. 63), and the Complaint (Dkt. No. 1). For the Court's convenience, the government provides the following summary.

**A.   The *MSC Ravenna***

Defendant and his M.S. were crewmembers from the Philippines aboard the *MSC Ravenna*, a huge container ship that travelled around the world. In September 2020, the *MSC Ravenna* was sailing from Shanghai to Los Angeles on a two-week voyage. M.S. was the bosun (or boatswain) aboard the ship, tasked with supervising the ship's crewmembers who worked on the deck (i.e., all of the crew other than

the engine crew and the kitchen staff).  M.S. was well-liked by his crew and the ship's officers:  he was thought of as fair and not overly strict.  Several crewmembers said that M.S. was like a coach; when crewmembers spoke to M.S., they referred to him as "maestro," a sign of respect.



*Figure 1: M.S. at home*



*Figure 2: M.S. at sea*

M.S. was the direct supervisor of defendant, who was an Able-Bodied Seaman, responsible for conducting repairs and maintenance and assisting with other tasks when the *MSC Ravenna* approached ports of call.  Crewmembers described defendant as friendly, cooperative, quiet, and competent.

Defendant, M.S., and the other crewmembers on the *MSC Ravenna* typically worked aboard the ship on eight-month contracts.

2

Defendant's and M.S.'s contracts both had started on January 11, 2020. Both of their contracts were scheduled to end on September 23, 2020, when they both were scheduled to fly home to the Philippines for several months of leave upon the *MSC Ravenna*'s arrival in Los Angeles. Unlike on previous voyages, the crewmembers had been stuck on the *MSC Ravenna* for almost the entire voyage due to COVID-19 restrictions; they had been unable to get off the ship at various ports of call.

The officers and crewmembers had not noticed any conflicts between defendant and M.S. during the voyage. In interviews conducted after the murder, some crewmembers said that, in the two or three days before the murder, they had noticed a change in defendant's behavior: he appeared restless, stressed, and distracted, and may have stopped changing his clothes or bathing.

**B. The Murder**

On the morning of September 20, 2020, the *MSC Ravenna* was approximately 80 nautical miles from Los Angeles. Around 8:00 a.m., the crewmembers were in a dressing room on the ship's upper deck preparing for their shifts and waiting for M.S. to arrive to provide their work assignments for the day. M.S. was on the ship's bridge, finishing up his routine morning meeting with his supervisor (the Chief Mate), during which they discussed the work to be assigned that day to the crew. As was usual, M.S. was carrying a knife in a sheath in his coveralls, which he used for cutting ropes and similar tasks. M.S. stored several such knives in his workshop aboard the ship. The other crewmembers, including defendant, were prohibited from carrying knives.

Defendant was among the crewmembers in the dressing room waiting for M.S. to arrive. Despite the prohibition on crewmembers carrying knives, defendant had brought a knife with him into the dressing room that morning, concealed in his clothing. Although defendant's job responsibilities could sometimes require him to use a knife, on the morning of September 20 he had not yet been given his work assignment by M.S., so there was no legitimate reason for him to bring a knife to the dressing room for the work-assignment meeting (as the Captain later confirmed).

When M.S. arrived in the hallway outside the locker room, he made a comment about how he and several crewmembers would be flying back to the Philippines in a few days. Defendant saw M.S. in the hallway and asked him to move into the locker room. M.S. declined, and defendant moved toward M.S., took out the knife he was carrying, and began stabbing M.S. in full view of the other crewmembers. M.S. grappled with defendant and the two fell to the floor. Defendant got on top of M.S. and continued stabbing him. Defendant was sitting on M.S.'s legs and stabbing him in the stomach. Defendant grabbed a second knife – the knife that M.S. had been carrying in a sheath in his coveralls – and unsheathed that knife with his mouth, and began to stab M.S. with both knives.

Speaking in Tagalog, M.S. begged defendant to stop. Crewmembers overhead M.S. ask defendant, "What is happening, Michael?" Defendant said to M.S., "You are the one that destroyed my family." M.S. replied, "I have no idea what you are talking about." During the struggle, crewmembers also heard M.S. tell defendant, "I hope the Lord forgives you" and "I'm dead Michael."

3

Crewmembers tried to stop defendant by yelling at him to stop and throwing a trash can at him twice, but they were unsuccessful. The Captain, Chief Mate, and Chief Engineer all arrived on scene during the incident. When the Captain arrived, defendant was still on top of M.S., who was no longer moving.

The Captain, risking his life, approached defendant unarmed and tried to calm him down. When the Captain asked defendant why he had attacked M.S., defendant said, "The bosun is bullshit." The Captain negotiated with defendant, hoping to separate defendant from M.S. so that the crewmembers could try to save M.S.'s life. After several minutes, the Captain finally was able to convince defendant to get off of M.S. and walk up a stairwell and into a conference room. After continued discussions, defendant placed the two knives on the conference room table and was escorted to his cabin.

M.S. was pronounced dead at 8:34 a.m. that morning. Because there was nowhere else to store M.S.'s body, the crewmembers had to place the body in the ship's walk-in fish refrigerator for storage until the ship arrived in Los Angeles.

For the remainder of the voyage, defendant was locked inside a cabin, which was guarded by his fellow crewmembers. Because there were no handcuffs aboard the ship, the crewmembers restrained defendant inside the cabin with plastic zip ties normally used for holding wiring together. In addition, the Captain raised the security level for the *MSC Ravenna* to a level used only when the ship was sailing through pirate-infested waters off the coast of Somalia; the crewmembers activated anti-pirate steel locks on hallway doors, conducted additional patrols, and cancelled all scheduled work except the jobs necessary to bring the ship into port. Despite the extra

safety precautions, the traumatized crewmembers and officers were terrified that defendant would escape from the cabin and attack them. Due to having witnessed the murder and their ongoing fear of being stuck onboard the ship with defendant, crewmembers and officers reported having trouble sleeping and concentrating.

When the *MSC Ravenna* arrived in Los Angeles, M.S.'s body was taken off the ship for an autopsy. The autopsy identified 31 stab wounds, several of which penetrated the left lung and heart. The autopsy identified an additional 13 incised wounds (i.e., shallower wounds caused by the knives but that were not deep punctures), most of which were on M.S.'s hands and evidenced his attempt to defend himself against defendant's attack.

### C. The FBI Interview

Two days after the murder, FBI agents boarded the *MSC Ravenna* and interviewed defendant. Defendant said that he did not like when M.S. yelled at him and he felt that M.S. was stalking him. Defendant thought that M.S. was following him around the ship, entering his cabin without his consent, hacking his Facebook account, and electronically interfering with his telephone calls. (There is no evidence supporting any of defendant's alleged concerns.) Defendant said that, prior to the murder, he did not want to have to go back to the Philippines, and he blamed M.S. for ruining his family.

Defendant admitted repeatedly stabbing M.S. Defendant said that on the morning of September 20, he saw M.S. in the hallway outside the crew locker room and told M.S. to enter the locker room, but M.S. did not do so. Defendant said that he then removed the knife that he had brought in the pocket of his overalls, and stabbed M.S. while they were both standing in the hallway. Defendant said that after

M.S. fell to the floor on his back, defendant got on top of M.S. and continued to stab him. Defendant said that he stopped stabbing M.S. only when he became too tired to continue.

### III. THE PRESENTENCE INVESTIGATION REPORT

The PSR found that the base offense level is 38 pursuant to U.S.S.G. § 2A1.2(a) because defendant's offense is most analogous to second-degree murder (18 U.S.C. § 1111). With a three-level reduction for acceptance of responsibility, defendant's total offense level is 35. The PSR found that defendant has no criminal history in the United States, so he fits within Criminal History Category I. Accordingly, the PSR found that defendant's Guidelines range is 168-210 months.

The government has no objections to the PSR.[1]

### IV. THE GOVERNMENT'S SENTENCING POSITION

The government respectfully recommends a sentence of 240 months. The base offense level of 38 for second-degree murder should apply

---

[1] The government makes one clarification for the record. Paragraph 15 of the PSR states, "According to the government, investigation revealed that Monegro intentionally obtained a knife ahead of time to use against Santillan." The government seeks to clarify its position and the source of its information.

As the government informed the Probation Office, on this issue the government is relying on the mental health report prepared on behalf of the defense. That report, at page 11, states, "After breakfast the morning of the offense, Mr. Monegro and [M.S.] passed one another on the stairwell, where they had the row about the threat, which left Mr. Monegro unsettled. After the stairwell interaction, Mr. Monegro stated his fear was heightened because [M.S.] always carried a knife. It was then that he retrieved the knife to protect himself."

Accordingly, based on the defense report, the government understands that defendant obtained the knife ahead of time to use if defendant believed he needed it to protect himself against M.S. To be clear, the government is not claiming that any evidence shows that when defendant retrieved the knife that morning he already planned on murdering M.S.

6

(U.S.S.G. § 2A1.2(a)), resulting in a Guidelines range of 168-210 months, from which an upward departure is warranted because of the brutal nature of the crime and the danger defendant poses to society.

If the Court disagrees with the government and the PSR and finds that the base offense level of 29 for voluntary manslaughter should apply (which would result in a Guidelines range of 63-78 months), the government still would recommend a sentence of 240 months because an even greater upward departure would be warranted.

### A. The Burden of Proof

As a preliminary matter, under the Ninth Circuit's current standard (which is erroneous, in the government's view), the Court must apply the heightened "clear and convincing" evidentiary standard when evaluating the government's argument that the second-degree murder Guideline applies, due to the impact that the application of that Guideline would have on defendant's sentence.  See United States v. Lonich, 23 F.4th 881, 910-16 (9th Cir. 2022); United States v. Valensia, 222 F.3d 1173 (9th Cir. 2001).

For the record, in the government's view, due process never requires application of the "clear and convincing" standard now that the Guidelines are advisory, as other circuit courts of appeal have held.  But because the Court must sentence defendant under the Ninth Circuit's framework, the Court should apply the "clear and convincing" standard when determining defendant's scienter.

### B. The Offense Level for Second-Degree Murder Should Apply

The difference between second-degree murder and voluntary manslaughter is the defendant's mental state at the time of the killing.  For the second-degree murder offense level to apply, defendant had to act with malice aforethought.  "To kill with malice

7

1 aforethought means to kill either deliberately and intentionally or
2 recklessly with extreme disregard for human life."  Ninth Circuit
3 Model Criminal Jury Instruction No. 16.2 (2022 ed.).

4 Here, defendant killed M.S. "deliberately and intentionally," as
5 the evidence establishes by a clear and convincing standard.  Most
6 notably, defendant intentionally obtained and brought the murder
7 weapon – a knife – with him ahead of time, specifically with M.S. in
8 mind.  He then concealed the knife in his coveralls and violently
9 attacked M.S. with the knife (and a second knife), even though M.S.
10 had no means to defend himself except his hands.  Defendant proceeded
11 to stab M.S. 31 times, stopping only when he was too tired to
12 continue.

13 Defendant's attack was not "[u]pon a sudden quarrel or heat of
14 passion," 18 U.S.C. § 1112 (defining voluntary manslaughter), for
15 several reasons.  First, there is no evidence that M.S. did anything
16 to provoke defendant's attack.  Second, even if defendant somehow
17 mistakenly felt provoked by M.S., defendant did not simply attack
18 M.S. with his fists or a nearby object.  Instead, defendant used the
19 knife that he admits he retrieved that morning in order to have it if
20 needed to use against M.S.

21 Third, to the extent that defendant "snapped" that morning due
22 to mental health issues, he did not simply stab M.S. a few times in
23 some sudden loss of self-control or a misplaced effort at self-
24 defense.  Instead, he stabbed M.S. 31 times, over an extended period
25 of time, during which defendant:

26     (1) took away M.S.'s knife so that M.S. had no way of defending
27 himself;
28     (2) used M.S.'s knife to inflict even more deadly wounds;

8

(3) continued stabbing M.S. even after his fellow crewmembers hit him over the head with a trash can;

(4) explained to M.S. that he was stabbing him because he believed that M.S. had destroyed his family;

(5) prevented the crewmembers from trying to save M.S.'s life by refusing to get off of M.S. for several minutes after the stabbings while the Captain negotiated with him; and

(6) refused to give up the two knives until after several more minutes of negotiating with the Captain.

Each of those facts evidences malice and establishes that defendant's act constitutes second degree murder.  See United States v. Celestine, 510 F.2d 457, 459 (9th Cir. 1975) ("Malice aforethought does not mean simply hatred or ill will, but also embraces the state of mind with which one intentionally commits a wrongful act without legal justification or excuse.").  And each of those facts evidences that, at some unknowable point just before or during the attack, defendant decided to kill M.S.

**C.   An Upward Departure Is Warranted**

A substantial upward departure is warranted, particularly if the Court applies the much lower Guideline for voluntary manslaughter, for the following three reasons.

First, Section 5K2.8 provides that an upward departure is appropriate when "the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim."  U.S.S.G. § 5K2.8.  "Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation."  Id.

Here, the brutal murder included both the "gratuitous infliction of injury" and the "prolonging of pain or humiliation."  Defendant

9

did not need to stab M.S. 31 times with two separate knives to kill him.  See, e.g., United States v. Kelly, 1 F.3d 1137, 1144 (10th Cir. 1993) ("we interpret the phrase 'gratuitous infliction of injury' to include the infliction of an injury beyond what is necessary to effectuate the death of the victim").  Yet defendant kept stabbing M.S., who remained conscious, until defendant was too tired to continue.  Even after M.S. told defendant, "I hope the Lord forgives you" and "I'm dead Michael," defendant persisted in the attack, thereby prolonging M.S.'s pain.  Even after the crewmembers hit defendant over the head with a trash can, defendant persisted.  And rather than let the crewmembers attempt to save M.S.'s life or at least comfort him, defendant remained on top of M.S.'s body, armed with two knives, until the Captain was able to persuade him to step away.  By that time, M.S. was motionless and likely dead.

Second, if the Court were to apply the Guideline for voluntary manslaughter, an upward departure would be warranted under Section 5K2.6 because defendant used a weapon in the commission of the crime.  See, e.g., United States v. Carpenter, 914 F.2d 1131, 1134 (9th Cir. 1990), superseded on other grounds, United States v. Caperna, 251 F.3d 827, 830 (9th Cir. 2001) ("the Sentencing Commission was well aware that possession of a weapon was a circumstance that was not always reflected in the different offense levels under the Guidelines.  If weapon possession were adequately reflected in the individual offense levels, there would be no reason for a separate departure provision"); United States v. Chase, 451 F.3d 474, 483 (8th Cir. 2006) ("We agree with the Seventh and Ninth Circuits' analyses and conclude that a § 5K2.6 departure may be appropriate when the underlying offense is voluntary manslaughter.  The voluntary

10

manslaughter guideline has not already accounted for the use of a weapon or dangerous instrumentality; it does not mention the use of weapons or dangerous instrumentalities, nor are weapons or dangerous instrumentalities inherent in the offense of voluntary manslaughter."). Here, defendant used two knives to stab M.S., over and over again, justifying a departure under Section 5K2.6.

Third, if the Court is not inclined to apply an upward departure under Sections 5K2.8 or 5K2.6, it may apply a departure pursuant to Section 5K2.0 because aggravating circumstances exist "of a kind, or to a degree, not adequately taken into consideration" by the Guidelines. 18 U.S.C. § 3553(b)(1). The aggravating circumstances here relate to the nature and seriousness of the offense as well as the need to protect the public from further crimes by defendant.

Defendant killed M.S. in a violent, unprovoked attack. The defense's arguments regarding defendant's mental health, even if credited, do not undo the brutality of the killing. In addition, the fact that the murder was carried out on an isolated ship at sea meant that there was no law enforcement available to apprehend defendant or to safeguard the surviving crewmembers. Many of the same crewmembers witnessed the murder in very close quarters and, for the rest of the voyage, they feared defendant would escape, potentially putting their own lives in danger.

Moreover, and perhaps most importantly, defendant remains a danger to society. Even if the Court agrees with the defense that defendant "snapped," there is no telling if or when he would snap again. A lengthy prison sentence is the best way to mitigate against that risk.

Finally, the tragic impact of defendant's conduct cannot be overstated. Defendant's murder of M.S. left behind M.S.'s wife and daughter, who was 17 at the time of the murder. M.S. was the sole bread winner for the family, and his death caused significant financial strain on the family. In addition, M.S.'s mother relied upon M.S. for financial support. M.S. was only 50 years old at the time of his murder. He likely would have lived many more years and been present for significant family milestones. His murder robbed his family of a father and husband.

**V.   CONCLUSION**

For the aforementioned reasons, the government respectfully recommends that the Court sentence defendant to 240 months' imprisonment, a five-year period of supervised release, and a special assessment of $100.

Dated: October 17, 2022          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


       /s/
MATTHEW W. O'BRIEN
MARK A. WILLIAMS
JEFFREY M. CHEMERINSKY
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA